UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID M REES and WENDY REES,

            Plaintiffs,

                                        CASE NO. 14-CV-12401
    v.                                  HONORABLE GEORGE CARAM STEEH

IRON WORKERS' LOCAL NO. 25
PENSION FUND, et al.,

            Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DISMISSING IN PART AS
MOOT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. #65),
DISMISSING AS MOOT PLAINTIFFS' EXPEDITED MOTION FOR
INJUNCTIVE RELIEF (DOC. #52), DISMISSING AS MOOT PLAINTIFFS'
MOTION TO RESOLVE OBJECTIONS TO THE JOINT APPENDIX (DOC. #70),
DISMISSING AS MOOT DEFENDANTS' MOTION TO RESOLVE OBJECTIONS
ON THE ADMINISTRATIVE RECORD (DOC. #69), DENYING DEFENDANTS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (DOC. #90),
AND DISMISSING AS MOOT PLAINTIFFS' MOTION TO STRIKE (DOC. #102)**

Plaintiff David Rees ("Mr. Rees") retired effective August 1, 2012 and received early

special retirement benefits from the defendant Iron Workers' Local No. 25 Pension Fund (the

"Pension Fund") for thirteen months.  Pursuant to the pension plan in effect at the time he retired,

Mr. Rees retired at the age of 51 under a special retirement benefit available to plan participants

with 30 years of service in the iron working industry.  Mr. Rees planned on working until October

2012, at which time he would have obtained the necessary hours of service in the 2012 plan year

to retire, but a Pension Fund trustee met with Mr. Rees and told him that he could retire two

months earlier by using "banked hours," i.e. hours that  his employer had not previously made

contributions on to the Pension Fund, but for which Mr. Rees had actually worked.

-1-

Shortly after Mr. Rees retired, on October 19, 2012, notice was given to plan participants that, effective for participants commencing benefits on November 1, 2012, the particular special retirement benefit Mr. Rees retired under would be eliminated. In other words, under the current plan in effect, a plan participant's years of service have no bearing on retirement eligibility; a plan participant will not receive benefits until reaching age 55, and full actuarial reductions occur if the participant retires before age 55. Retirement is no longer possible based on achieving 30 years of service in the iron working industry.

After receiving special retirement benefits for thirteen months, the Pension Fund discontinued Mr. Rees's benefits on September 25, 2013. Mr. Rees was notified by the Pension Fund Administrator that an audit revealed that he worked "unusually high" hours in the 2012 plan year. Specifically, according to the Pension Fund Administrator, Mr. Rees could not use his "banked hours" towards calculating his time of service. Rather, Mr. Rees was informed that he had to have actually worked the hours in the 2012 plan year. As a result, the Pension Fund discontinued Mr. Rees's benefits. By this time, as explained above, the benefit under which Mr. Rees retired was eliminated.

Mr. Rees returned to iron work in October 2013 for a different employer for six months, obtaining an additional year of service. However, his health deteriorated. Under the current Pension Plan in effect, Mr. Rees is not eligible to receive benefits unless and until he reaches age 55.

Plaintiffs, Mr. Rees and his wife Wendy Rees ("Mrs. Rees"), filed this action to restore Mr. Rees's benefits and Mrs. Rees's survivorship benefits, which are equal to the benefits Mr. Rees was to receive for his lifetime under the Pension Plan in effect on August 1, 2012. The third amended complaint (Doc. #43) alleges:

Count I         Claim For Benefits Due Under ERISA §502(a)(1)(B)

Count II        Failure To Comply With Notice Requirements Under ERISA §§204(h) & 305(e)(8)(C)

Count III       Claim For Breach Of ERISA Fiduciary Duties In Violation Of ERISA §§502(a)(2) And/Or (3)

Count IV        Violation Of ERISA §510

Count V         Violation Of ERISA §204(g)

Count VI        Claim For Co-Fiduciary Breach In Violation Of ERISA §405

Count VII       Federal Common-Law Equitable Estoppel

Now before the court are (1) plaintiffs' expedited motion for injunctive relief (Doc. #52); (2) plaintiffs' motion for summary judgment (Doc. #65); (3) defendants' motion to resolve objections on the administrative record (Doc. #69); (4) plaintiffs' motion to resolve objections to the joint appendix (Doc. #70); (5) defendants' motion for judgment on the administrative record (Doc. #90); and (6) plaintiffs' motion to strike defendants' response to plaintiffs' motion for summary judgment (Doc. #102). The court held a hearing to address the motions on September 16, 2015. For the reasons that follow, the court will grant in part and dismiss in part as moot plaintiffs' motion for summary judgment, dismiss as moot plaintiffs' expedited motion for injunctive relief, dismiss as moot plaintiffs' motion to resolve objections to the joint appendix, dismiss as moot defendants' motion to resolve objections to the administrative record, deny defendants' motion for judgment on the administrative record, and dismiss as moot plaintiff's motion to strike. Judgment shall enter in favor of plaintiffs and against the defendant Pension Fund.

## I. BACKGROUND

Mr. Rees was employed as an iron worker for the majority of his life. As an iron worker, he was a member of the Iron Workers' Local Union No. 25 and a participant in the defendant Pension Fund and Iron Workers' Local No. 25 Pension Plan (the "Pension Plan"). The Pension Fund is a multi-employer pension trust fund established under Section 302 of the Labor Management Relations Act ("LMA"), 29 U.S.C. § 186 and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The Pension Fund was established through the Collective Bargaining Agreement entered into between Local Union No. 25 International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO (the "Union"), and multiple employers who employ members of the Union. A Board of Trustees (comprised of three Union representatives and three employer association representatives) administers the Pension Fund in accordance with the Pension Plan documents. (Doc. #104 at 7). As of April 14, 2015, the Pension Fund has been under Union supervision and control as an emergency measure because it is in critical status. (Doc. #52-23).

In 2012, Mr. Rees applied for, and was granted, a special retirement benefit under the Pension Plan commonly referred to as the "30 and Out" benefit. In short, at the time Mr. Rees applied for retirement, the 30 and Out benefit allowed an eligible plan participant to retire after obtaining 30 years of credited service, subject to certain reductions if the plan participant retired prior to the age of 58. One year of credited service required 870 hours during a particular "Plan Year." An "Hour of Service" is defined in the Pension Plan:

> Hour of Service (a) is each hour for which an Employee is paid or entitled to payment by a Contributing Employer on account of a period of time during which actual duties are performed; and (b) an Hour of Service shall be granted for each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Contributing Employer, to the extent that such award of employment is intended to compensate the Employer for periods during which the Employee would have been engaged in the performance of duties for the

-4-

Employer.  All Hours of Service shall be credited in accordance with Department of Labor Regulation 2530.200b-3(d).

(2010 and 2013 Pension Plans).

Mr. Rees submitted his application for retirement at the age of 51.  Under the 2010 Pension Plan in effect at the time he submitted his retirement application, Mr. Rees's benefits were subject to a full actuarial reduction until reaching age 55, and a 0.5% monthly reduction thereafter until reaching age 58.  However, as will be explained below, effective November 2012 the Pension Plan was amended to eliminate the 30 and Out benefit altogether such that a plan participant cannot retire until reaching age 55, regardless whether the plan participant worked for 30 years.

At the time he retired under the 2010 Pension Plan, Mr. Rees was working for Metro Industrial Contracting ("Metro Industrial").  As it got closer to October 2012, Mr. Rees contacted Metro Industrial's president, Ed Buckle ("Buckle"), and communicated his intention of retiring in October 2012 under the 30 and Out benefit because of his declining health.  Buckle contacted Jack O'Donnell ("Trustee O'Donnell"), a Union-representative trustee of the Pension Fund. (Buckle Aff. ¶¶ 8–9; Doc. #52-24 at 2).  Trustee O'Donnell requested a meeting with Mr. Rees and Buckle to discuss Mr. Rees's retirement options.  (*Id.* ¶¶ 7,10; Doc. #52-24 at 3–4).  The meeting occurred on June 11, 2012.  At the meeting, Trustee O'Donnell "made representations to Mr. Rees relating to his eligibility for a Special Retirement benefit, and encouraged him to apply for benefits under the 2010 Plan."  (*Id.* ¶ 7; Doc. #52-24 at 3).  Mr. Rees informed Trustee O'Donnell that he was "committed to fulfilling all requirements necessary to complete his 30 years of service, including working for 870 hours beginning with the" 2012 Plan Year, and, that after working the 870 hours, he would retire effective October 1, 2012.  (*Id.* ¶ 10; Doc. #52-24

at 4).  However, "[a]ware of Mr. Rees' medical condition, Trustee O'Donnell suggested instead . . . that Mr. Rees could retire earlier because he had previously actually worked hours for Metro for which he was entitled to payment but for which he had not yet been paid[.]" (*Id.* ¶ 11). Trustee O'Donnell told Mr. Rees that "these 'banked hours' actually worked [would] be distributed among the months of May, June and July of 2012 (in addition to the 40-plus hours per week that Mr. Rees performed services for Metro in May, June and July of 2012), so that he would be eligible to retire with a Special Retirement, effective August 1, 2012." (*Id.*).

Relying on Trustee O'Donnell's statements to Mr. Rees that he could use his "banked hours" towards attaining the 30 and Out benefit, Buckle, on behalf of Metro Industrial, submitted documentation to the Fund Administrator's office showing that Mr. Rees worked 1,008 hours in the 2012 Plan Year.  (*Id.* ¶ 13–14; Doc. #52-24 at 5).  Metro Industrial made all of the necessary contributions on those hours.  Buckle attests that Metro Industrial would have retained Mr. Rees as an employee until he reached the 870 hours of service required in 2012 to obtain the 30 and Out benefit were it not for Trustee O'Donnell representing that Mr. Rees could use his "banked hours" and retire effective August 1, 2012.  (*Id.* ¶ 15).  Mr. Rees received calculations from the Fund Office explaining to him what his retirement benefits would be upon retiring on August 1, 2012.  For example, on July 11, 2012, the Fund Office provided Mr. Rees with a pension qualification report acknowledging that Mr. Rees would be eligible for early retirement effective August 1, 2012, with a monthly benefit of $4,532.17 to him for his lifetime, and, in the event he were to die, to his wife for her lifetime.  (Wendy Rees Aff Ex. 3).

After working 40-plus hours per week through July 31, 2012, Mr. Rees submitted a pension application for retirement, dated July 31, to be effective August 1, 2012.  Mr. Rees

-6-

selected the 100% Contingent Person Option for the remainder of his lifetime and the 100%

Qualified Joint and Survivor Option for the lifetime of his wife.  The 2010 Pension Plan provided:

> [E]ffective October 1, 2003, if the Active Participant dies having attained at least
> 30 Years of Service, the surviving spouse may elect the survivor portion of the
> 100% joint and survivor benefit, calculated as if the participant had retired on the
> date of his death and elected the 100% joint and survivor option, to begin
> immediately.

(2010 Pension Plan Section 6.1).

Pension Plan Administrator Dennis Kramer ("Plan Administrator Kramer") contends that

he reviewed Mr. Rees's application for retirement and determined that he was eligible for one

year of credited service for the 2012 Plan Year, totaling 30 years of service overall.  (Kramer Aff.

at 3).  In a letter dated August 1, 2012, the day after Mr. Rees submitted his application for

retirement, Plan Administrator Kramer explained to Mr. Rees that his application was approved:

> Dear Mr. Rees:
>
> Enclosed please find a check in the gross amount of $4,532.17 representing the
> initial payment of your retirement benefits under the Iron Workers Local 25 Pension
> Plan.  This payment is for the month of August 2012.  Subsequent pension checks
> will be sent to you on the first day of the month for which such payment is due.
> Your monthly benefit will be in the amount of *4,532.17* computed as follows:
>
> | | | |
> |---|---|---|
> | (a) | Early Monthly Benefit Amount | $5,050.48 |
> | (b) | Reduced Monthly Benefit payable under the "100% Continent Pension Option" for your remaining lifetime | $4,532.17 |
> | (c) | Monthly Benefit payable under the Option for the lifetime of your spouse, if she survives you | $4,532.17 |
>
> * * * *
>
> The Trustees of this Fund wish to take this opportunity to express to you their
> gratitude for the years of services that you have given to the Industry.
>
> Good luck on your retirement.

-7-

(Wendy Rees Aff. Ex. 4).

However, there is evidence in the record that Plan Administrator Kramer never actually reviewed the hours worked by Rees in the 2012 plan year prior to communicating on behalf of the Pension Fund that Mr. Rees's retirement application was approved.  A report of Mr. Rees's hours worked at Metro Industrial in the 2012 plan year was not generated until August 2, 2012 at approximately 1:30 p.m., the day after Plan Administrator Kramer sent the letter to Mr. Rees. (Doc. #101).

After receiving the August 1 letter from Plan Administrator Kramer, Mr. Rees continued to receive retirement benefits for thirteen months.  Early on during that time period, on October 19, 2012, the Pension Fund issued a notice informing participants of upcoming changes to the Pension Plan.  Relevant here, the notice informed participants of a change to the Pension Plan eliminating the 30 and Out benefit:

**Special Retirement Benefit Based on 30 Years of Service**

Currently, the Plan provides that an Active Participant with 30 Years of Service will be eligible for an unreduced pension benefit when he reaches age 58.  If he chooses to retire prior to age 58, his pension benefit is reduced 0.5% per month (6% per year) from age 55 to 58, with a full actuarial reduction for each year prior to age 55 (not to exceed 6% per year).

Effective for participants commencing benefits on or after November 1, 2012, an Active Participant will not be eligible to retire prior to age 55, even if he/she has 30 Years of Service.  Further, the benefit of an early retiree will be subject to a full actuarial reduction for each year prior to age 62.

(Doc. 52-7 at 3).  The notice informed participants that the changes applied "to any participant or beneficiary who begins receiving benefits on or after November 1, 2012, and will take effect with December 1, 2012 benefit payments (for example, if a participant retires and begins receiving benefits November 1, his November benefit payment will be calculated under the

-8-

existing rules and benefits payable on or after December 1 will be calculated under the new rules)." (*Id.* at 2).

Moreover, although not in the notice, the amended Pension Plan changed the joint and survivor benefit. Under the existing 2013 Pension Plan, if an active plan participant dies on or before the date on which the participant would have attained the earliest retirement age, the surviving spouse's benefits are subject to a full actuarial reduction. (2013 Pension Plan Section 6.1).

After receiving benefits for thirteen months (and after the special retirement benefit was eliminated), Plan Administrator Kramer notified Mr. Rees that a routine audit of Metro Industrial revealed that Mr. Rees worked an "unusual number of hours" in May, June and July 2012. (Wendy Rees Aff. Ex. 9). In a letter dated June 14, 2013, Kramer asked Mr. Rees to submit:

- Proof that you worked 360 hours in May 2012, to support the additional 200 hours contributed on your behalf. If you did not in fact work these hours, the Fund Office must return these contributions to Metro, which would mean you did not have sufficient hours to retire and begin drawing a benefit as of August 1, 2012.

- Proof that you actually worked 288 (or 296) hours in June 2012 and 360 hours in July 2012. These are unusually high hours. You may provide any proof you may have, including descriptions of the jobs involved and why it was necessary for you to work these hours. If you did not in fact work these hours, the Fund Office must return the excess contributions to Metro, which may mean you did not have sufficient hours to retire and begin drawing a benefit as of August 1, 2012.

(*Id.*). Mr. Rees alleges that he received this letter after he questioned some of the Pension Fund's foreign investments.

In response to the June 14 letter sent to Mr. Rees, Metro Industrial sent Plan Administrator Kramer its payroll register. However, in a letter dated June 27, 2013, Plan Administrator Kramer informed Mr. Rees that "this is the same payroll register reviewed by the

-9-

Fund auditor that led to our questions regarding the accuracy of hours reported." (Wendy Rees Aff. Ex. 10). Plan Administrator Kramer again asked Mr. Rees to provide support for the hours contributed by Metro Industrial on his behalf, otherwise "the Fund Office cannot continue benefit payments beyond July 2013." (*Id.*). In response to this letter, Mrs. Rees obtained Mr. Rees's W-2 tax forms for the year ending December 31, 2012 and sent them to Plan Administrator Kramer. (Doc. 52-2 at 9). Moreover, Mrs. Rees contends that Mr. Rees told her that he had been in contact with Trustee O'Donnell who was resolving the issue for him with Plan Administrator Kramer. (*Id.*).

Mr. Rees responded to Plan Administrator Kramer's June 27th letter in a letter dated July 16, 2013. (Wendy Rees Aff. Ex. 12). Mr. Rees informed Kramer that "[t]he hours in question were accumulated over a year or so period." (*Id.*). Mr. Rees explained the hours were "banked" from overtime hours worked during the week and on Saturdays. (*Id.*). The letter attached a worksheet explaining the hours worked in the 2012 plan year.

Plan Administrator Kramer responded to Mr. Rees again by letter on August 5, 2013. (Wendy Rees Aff. Ex. 11). The letter states, in pertinent part:

> Perhaps there has been some misunderstanding. We would like to provide you with an additional opportunity to provide the information needed to avoid cessation of your benefits.
>
> A Year of Service is credited to a participant when they have 870 hours of work in a plan year. The plan year for the Iron Workers' No. 25 Pension Fund begins May 1st. To establish that you had sufficient credited service to retire as of August 1, 2012, the Fund Office must receive proof that you actually worked 870 hours from May 1, 2012, through July 31, 2012.
>
> Therefore, proof of hours worked in 2010, 2011, or in 2012 prior to May 1, 2012, are not taken into consideration.

(*Id.*).

-10-

Mrs. Rees says that, during the time Plan Administrator Kramer was sending letters to her husband, Mr. Rees was in constant contact with Trustee O'Donnell who advised him how to respond.  (Doc. #52-2 at 11).  She contends that Trustee O'Donnell told Mr. Rees that his responses to Plan Administrator Kramer would "satisfy the inquiry into his credited hours of service."  (*Id.*).  Moreover, on August 15, 2013, Buckle and Mr. Rees sent letters to Plan Administrator Kramer in support of the hours worked by Mr. Rees in the 2012 plan year.  (Defs'. Preliminary Injunction Br., Ex. C).  Buckle explained to Kramer that he was submitting time sheets on behalf of Mr. Rees that, "to the best of [his] knowledge and ability, accurately reflect[ed] the wages and fringe benefits paid to Mr. Rees for the period in question and [were] consistent with documentation previously provided."  (*Id.*).

Plan Administrator Kramer was not satisfied with the responses.  In a letter dated September 25, 2013, Plan Administrator Kramer informed Mr. Rees that his retirement benefits would be suspended:

> After reviewing all the information you have submitted, we have concluded that you did not have 870 Hours of Service from May 1, 2012, through July 31, 2012.  As a result, you did not have 30 Years of Service as of August 1, 2012, and were not eligible to retire.  See Plan at Section 3.2 and 4.7.  Therefore, you will not receive any further benefit payments.  When you are eligible to retire, your benefit will be adjusted for any benefit payments made to date.

(Wendy Rees Aff. Ex. 15).  The decision to discontinue benefits was made long after the 90-day period (180 days if special circumstances exist) the Pension Plan sets forth as the relevant period for making a decision regarding benefits.  (*Id.*, Ex. 7 at 21).  Plan Administrator Kramer explained that Mr. Rees had the opportunity to appeal the determination to the Board of Trustees.

-11-

Mr. Rees filed a timely appeal (prepared by his wife) with the Board of Trustees. (*Id.*, Ex. 16). In his appeal, Mr. Rees informed the Board of Trustees that, "every year, beginning in 1986, I was credited with more than a year of service. At no point has anyone . . . questioned my overtime hours for any year of service until 2012." (*Id.*). Mr. Rees also explained that his application for early retirement was completed only after discussing his hours worked, including the banked hours, with Trustee O'Donnell and Metro Industrial. (*Id.*). Mr. Rees's appeal was denied on December 23, 2013. (*Id.*, Ex. 17).

While his appeal was pending before the Board of Trustees, Mr. Rees returned to iron work in October 2013 primarily in confined spaces such as blast furnaces. (Doc. 52-2 at 15). He continued in iron work until April 30, 2014 when he obtained 870 hours to add an additional year of service. (*Id.* at 16). However, as explained, by this time the 30 and Out benefit was eliminated.

As explained above, plaintiffs seek immediate consideration and a preliminary injunction given Mr. Rees's current health, which became worse after his return to iron work in 2014. The specific medical conditions Mr. Rees suffers from are part of the sealed record in this case.

## II. LEGAL STANDARD[1]

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241

---

[1] Given the court's decision granting summary judgment to plaintiffs and dismissing the remaining motions as moot, as explained below, the summary judgment standard is the only relevant standard the court applies in this opinion and order.

F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence from which a

-13-

jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

As explained above, plaintiffs allege multiple violations under ERISA, as well as a claim of federal common law equitable estoppel.  The court begins its analysis by addressing the equitable estoppel claim (Count VII).  For the reasons explained below, the court determines that plaintiffs are entitled to summary judgment on their equitable estoppel claim.  Therefore, the court does not reach the remainder of the claims.  Moreover, the court will deny defendants' motion for judgment on the administrative record because plaintiffs are entitled to judgment in their favor.

### A. Equitable Estoppel (Count VII)

Plaintiffs bring a claim under federal common law seeking equitable estoppel against defendants.  This claim only applies against the Pension Fund.  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 553 (6th Cir. 2012) ("Moreover, only the Fund can potentially be estopped from doing anything, because it is the only defendant that pays pension benefits in accordance with plan documents.") (citing *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1299 (6th Cir. 1991)).

The Sixth Circuit recently explained that equitable estoppel claims are cognizable claims in ERISA pension benefit cases "where the representation was made in writing and where the plaintiff can demonstrate extraordinary circumstances."  *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 441 (6th Cir. 2010).

The Sixth Circuit explained:

Under our precedent, the elements of an equitable estoppel claim are: 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be

-14-

estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Id.* at 442 (citation omitted).

In *Bloemker*, the plaintiff applied for early retirement benefits after receiving an "estimate" of what his benefits would be from the pension plan's third-party administrator. *Id.* at 439. Less than one month after he applied for the benefits, the third-party administrator certified that, "[b]ased on our records of your hours worked under the Plan and the contributions which have been made on your behalf . . . , you are entitled to receive the retirement benefit specified above[.]" [$2,339.47 per month for his life and $1,169.75 per month to his wife if she were still living after his death]. *Id.* However, after receiving benefits for approximately two years, the plan administrator contacted the plaintiff and explained that an audit revealed that the calculation of benefits was incorrect due to a computer programming error. *Id.* The plaintiff was informed that his benefit should have been $1,829.71 per month and that he was required to pay $11,215.16 overpaid to him. *Id.* The plaintiff exhausted his administrative appeals and filed a federal lawsuit against the pension fund alleging, among other things, a theory of federal common law equitable estoppel. *Id.* at 440.

Reversing the district court's decision dismissing the equitable estoppel claim, the Sixth Circuit reasoned:

Bloemker has alleged a valid claim for equitable estoppel. . . He alleges that he received a document stating that he could elect a pension benefit of $2,339.40 per month for life with an additional benefit of $1,169.75 per month for his wife after his death if she survived him. This document stated that [the plan administrator] certified that Bloemker was entitled to receive that benefit. It clearly satisfies the first estoppel requirement. The second element requires the plaintiff to demonstrate that the defendant's actions "contain[ed] an element of fraud, either

-15-

intended deception or such gross negligence as to amount to constructive fraud," *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007) (quoting *Trs. of Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000)), which Bloemker has done by alleging that the Plan and [the plan administrator] were aware of the true facts and that they intended for Blomker to rely upon their representations. These allegations also satisfy the third estoppel element. Finally, Bloemker has alleged that he was not aware of the true facts, and that he relied upon these misrepresentations when deciding to retire, which is sufficient to satisfy the remaining elements of estoppel.

*Id.* at 442–43.

The Sixth Circuit in *Bloemker* recognized that its decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc), held that estoppel "'cannot be applied to vary the terms of the unambiguous plan documents.'" *Id.* at 443 (citing *Sprague*, 133 F.3d at 404). Nevertheless, the court explained that the two justifications in *Sprague* [1) reliance can seldom be reasonable or justifiable if inconsistent with the clear language of the unambiguous plan documents; and 2) allowing estoppel to override clear plan document terms would enforce something other than the plan documents themselves], did not apply to the extraordinary circumstances before the court. Thus, as explained, the court held that "a plaintiff can invoke equitable estoppel in the case of unambiguous pension plan provisions where the plaintiff can demonstrate the traditional elements of estoppel, including that the defendant engaged in intended deception or such gross negligence as to amount to constructive fraud, plus (1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Id.* at 444.

Important to the court's decision in *Bloemker* was that, even under the unambiguous plan documents, it was "impossible for the plaintiff to determine his correct pension benefit due to the complexity of the actuarial calculations and his lack of knowledge about the relevant actuarial

-16-

assumptions used." *Cataldo*, 676 F.3d at 554 (citing *Bloemker*, 605 F.3d at 443). In other words, "[i]t was not a situation where a clear answer to the plaintiff's question about his plan was easily answered by reference to plan documents, and the information provided by the plan administrator—how much the plaintiff would receive each month in benefits—could not be contradicted by the plan documents." *Id. C.f. Haviland v. Metropolitan Life Ins. Co.*, 876 F.Supp.2d 946, 960–61 (E.D. Mich. 2012) (Cohn, J.), *aff'd* 730 F.3d 563 (2013) ("[P]laintiffs here knew, or should have known, from the unambiguous language of the Plan documents that GM could reduce or eliminate their continuing life insurance benefits at any time. *Bloemker* cannot save plaintiffs' estoppel claim.").

Applying the Sixth Circuit's decision in *Bloemker*, Judge Sean Cox recently granted summary judgment to a plaintiff plan participant on a federal common law equitable estoppel theory under similar facts as this case. *Paul v. Detroit Edison Co.*, — F.Supp.3d —, 2015 WL 1469314 (E.D. Mich. 2015). In *Paul*, the plaintiff worked for Michigan Consolidated Gas Company ("MichCon") from 1984 until his retirement in 2009, and he participated in the DTE Gas Company Retirement Plan. *Id.* at *1. The plaintiff began considering retirement in late 2007. *Id.* To facilitate the plaintiff's retirement, the third-party plan administrator sent the plaintiff pension calculation statements on multiple occasions estimating his potential retirement benefits. *Id.* In addition, the plaintiff and his wife met with a company representative for a retirement interview in 2009, where pension calculations and credited service were discussed, among other things. *Id.* The plaintiff and his wife were also given a pension election authorization form detailing the specific pension benefits they would receive upon the plaintiff's retirement. *Id.* at *2. This form certified that "DTE Energy reserves the right to correct any errors. . . Under the law, a plan must be operated in accordance with its terms." *Id.*

-17-

After meeting with a company representative, the plaintiff in *Paul* retired under an early retirement benefit on July 1, 2009, two years prior to when he would have been eligible to receive an unreduced early retirement benefit.  *Id.*  After the plaintiff had received benefits for two years, during an audit in 2011, the plan administrator "discovered that the years of credited service used to calculate Plaintiff's pension benefit were overstated by 3.00365 years."  *Id.*  The plaintiff was notified of the error in December 2011, and informed that his monthly annuity would be reduced by $54.42 per month.  *Id.* at *3.  In addition, the plaintiff was told that he had been overpaid in the amount of $17,776.35, and he was given multiple options to repay the excess benefits.  *Id.*  The plaintiff objected to the correction of his benefits arguing that he would not have retired if he was not assured that the calculation of his credited service and monthly benefits was correct.  *Id.*  The pension plan's committee representative denied the plaintiff's appeal insofar as it related to the monthly reduction of benefits but reversed the decision requiring the plaintiff to repay the excess benefits he received in error.  *Id.*  The plaintiff filed suit against the pension fund alleging a theory of equitable estoppel seeking to prevent the pension fund from reducing his monthly benefits.

Applying the equitable estoppel factors articulated in *Bloemker*, the court concluded that there were no genuine issues of material fact precluding summary judgment in favor of the plaintiff.  First, the court held that plaintiff was misled by a plan representative into believing that (1) a statement given to him at his retirement interview accurately represented his credited years of service; and (2) his multiple pensions would be bridged together beginning with his 1984 hire date.  *Id.* at *6.  Second, the court determined that the assurances made to the plaintiff, which were a "crucial aspect" of his decision to retire, "were so grossly negligent as to amount to constructive fraud upon Plaintiff."  *Id.* at *7 (citations omitted).  Third, the court explained that the

plan administrator's meeting with plaintiff and his wife for the very purpose of conducting a retirement interview evidenced an intention that plaintiff rely on the representations made to him and conduct "meant to facilitate Plaintiff's retirement." *Id.* at *8.  Fourth, the court held that plaintiff was unaware of the true facts because he did not calculate his own benefits and the defendants conceded that the third-party plan administrator calculated the benefits. *Id.*  Fifth, the court reasoned that the plaintiff justifiably relied on the assurances made to him and suffered financial damage when his pension was reduced.  *Id.*  Sixth, the court determined that the pension calculation statements provided to the plaintiff satisfied the "written representation" requirement.  Seventh, the court found that it was impossible for the plaintiff "to have known that his benefits were miscalculated by simply looking at the unambiguous plan language because those calculations required complex actuarial knowledge." *Id.* at *9 (citation omitted).  Finally, the court held that the circumstances surrounding the plaintiff's reliance on the representations made to him were "nothing short of extraordinary." *Id.* at *10.

The court finds that *Paul* is persuasive authority in this case.  Here, like *Paul*, plaintiffs have conclusively established their equitable estoppel claim.  Applying the *Bloemker* factors, the court determines that plaintiffs are entitled to summary judgment on this claim.

### 1. Representations of material fact

Multiple material factual representations were made to Mr. Rees at the time he was considering early retirement under the 30 and Out benefit.  First, as explained above, Trustee O'Donnell represented to Mr. Rees in a meeting at Metro Industrial on June 11, 2012 that Mr. Rees could use his "banked hours" to retire as early as August 1, 2012 under the 30 and Out benefit.  At the time Trustee O'Donnell made the representation, he knew of Mr. Rees' declining health, and he was aware that Mr. Rees intended to work until he obtained the requisite 870

-19-

hours needed for the 2012 Plan Year before retiring under the special retirement benefit.  When Trustee O'Donnell met with Mr. Rees and Buckle, he knew that Mr. Rees had not worked 870 hours in the 2012 Plan Year, yet he told Mr. Rees he could retire using his "banked hours."

Notably absent in response to plaintiffs' motion for summary judgment is a denial that Trustee O'Donnell represented to Mr. Rees that he could retire earlier than expected using his "banked hours."  Defendants instead argue that the Pension Fund cannot be bound by Trustee O'Donnell's representation to Mr. Rees that he could retire using his "banked hours," and that there is no evidence that Trustee O'Donnell ever told Plan Administrator Kramer of his conversation with Mr. Rees.  Indeed, Plan Administrator Kramer denies that Trustee O'Donnell ever told him about the conversation.  The court is not persuaded by this argument.  At a minimum Trustee O'Donnell had apparent authority to make representations on behalf of the Pension Fund and Plan when dealing with a plan participant such as Mr. Rees.  Thus, it makes no difference whether Trustee O'Donnell relayed his conversation with Mr. Rees and Buckle to Plan Administrator Kramer.  As a union representative of the Pension Fund, Trustee O'Donnell was in a position to make representations that would influence Mr. Rees's retirement decisions.  Moreover, it was Trustee O'Donnell who initiated the meeting with Buckle and Mr. Rees when Buckle told Trustee O'Donnell that Mr. Rees was planning on retiring in October 2012.  To suggest that Trustee O'Donnell was not in a position of authority when he met with Buckle and Mr. Rees is not a credible argument.

At oral argument, counsel for defendants suggested that Trustee O'Donnell may be personally liable for the representations he made to Mr. Rees, but that the Pension Fund cannot be liable.  The court disagrees.  As explained above, the Pension Fund, not Trustee O'Donnell, has revoked Mr. Rees's benefits.  Thus, it is the Pension Fund that can potentially be estopped

-20-

from doing anything. *Cataldo*, 676 F.3d at 553. In meeting with Buckle and Mr. Rees, Trustee O'Donnell essentially was acting on behalf of the Pension Fund.

Defendants also argue that it would be unfair to grant summary judgment to plaintiffs and to credit their version of what Trustee O'Donnell said when discovery is ongoing and it is not clear what Trustee O'Donnell may say at a deposition. Counsel for defendants argued that Trustee O'Donnell is no longer a trustee of the Pension Fund, and, that at some point in the future, it may be necessary for Trustee O'Donnell to obtain separate counsel. However, counsel for defendants remains counsel of record for Trustee O'Donnell. Thus, the court is not persuaded by this argument. Moreover, there are procedures set forth in the Federal Rules of Civil Procedure when a party, in responding to a summary judgment motion, believes that further discovery is warranted.[2] Defendants did not follow those procedures. The Federal Rules allow the court to defer ruling on a motion for summary judgment when additional discovery is requested. Rule 56(d) directs:

> **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > **(1)** defer considering the motion or deny it;
> >
> > **(2)** allow time to obtain affidavits or declarations or to take discovery; or
> >
> > **(3)** issue any other appropriate order.

Fed. R. Civ. P. 56(d). Defendants have not, through affidavit or declaration, stated what additional discovery is necessary and how that discovery would change anything. Failure by

---

[2] At oral argument, defendants' counsel argued that further discovery could be gained from Mr. Rees who, at this juncture, is not capable of answering discovery or appearing for a deposition. Moreover, defendants' counsel stated that Trustee O'Donnell's deposition testimony may be helpful.

defendants' counsel to file an affidavit or declaration defeats any claim that additional discovery is needed.  *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) ("We, like other reviewing courts, place great weight on the Rule 56[(d)] affidavit, believing that '[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement . . . to set out reasons for the need for discovery in an affidavit.'").

Second, material representations were made to Mr. Rees even after his conversation with Buckle and Trustee O'Donnell.  Before Mr. Rees decided to retire, he received multiple written communications from the Fund Office confirming the amount of benefits he would receive upon retirement.  Most notably, on July 11, 2012, the Fund Office provided Mr. Rees with a pension qualification report acknowledging that Mr. Rees would be eligible for early retirement effective August 1, 2012, with a monthly benefit of $4,532.17 to him for his lifetime, and, in the event he were to die, to his wife for her lifetime.  After Mr. Rees applied for early retirement, Plan Administrator Kramer sent him a letter on August 1, 2012 enclosing his first retirement check in the amount of $4,532.17 (consistent with the calculations Mr. Rees received from the Fund Office), and informing him of the benefits he should continue to expect.  (Wendy Rees Aff. Ex. 4).  As explained above, Kramer's letter informed Mr. Rees that his "monthly benefit will be in the amount of *$4,532.17* computed as follows:"

| | | |
|---|---|---|
| (a) | Early Monthly Benefit Amount | $5,050.48 |
| (b) | Reduced Monthly Benefit payable under the "100% Continent Pension Option" for your remaining lifetime | $4,532.17 |
| (c) | Monthly Benefit payable under the Option for the lifetime of your spouse, if she survives you | $4,532.17 |

-22-

(*Id.*).  These were representations made to Mr. Rees, in writing, that he was eligible for the special retirement benefits he applied for in July 2012.  These representations are sufficient to satisfy the first equitable estoppel element even if the court does not consider Trustee O'Donnell's statements made to Mr. Rees and Buckle.

### 2. Awareness of the true facts by the party to be estopped

To establish awareness of the true facts by the party to be estopped (the Pension Fund), plaintiffs must show an element of fraud, "either intended deception or such gross negligence as to amount to constructive fraud."  *Bloemker*, 605 F.3d at 443.  Defendants argue that there has been no showing of fraud.  However, the court finds that plaintiffs have established gross negligence sufficient to establish constructive fraud.

This case is similar to *Paul*.  In *Paul*, Judge Cox explained:

> The Court finds that what transpired in this case was more complicated than the "honest mistake" in *Stark* [*v. Mars, Inc.*, 879 F.Supp.2d 752 (S.D. Ohio 2012), *aff'd*, 518 F. App'x 477 (6th Cir. 2013))].  Cognizant that the different union and non-union positions Plaintiff held during his employment complicated the calculation of his years of credited service, Plaintiff sought clarification of those calculations from the company representative at the retirement interview.  The company representative assured Plaintiff that the calculation of his years of credited service was correct.  The Overpayment Notice, however, clearly states that the very calculations that the company representative assured Plaintiff were correct at the retirement interview were in fact miscalculated.  The Court finds that the company representative's assurances, which were a crucial aspect of Plaintiff's decision to retire effective July 1, 2009, were so grossly negligent as to amount to constructive fraud upon Plaintiff. [citations omitted].

2015 WL 1469314, at *7.

Here, Mr. Rees met with Trustee O'Donnell and Buckle in June 2012 when he had less than four months remaining before reaching the 870 hours required in the 2012 plan year to retire under the 30 and Out benefit in October 2012.  Mr. Rees expressed his intention to retire in October 2012, but it was Trustee O'Donnell who told him he could retire under the special

retirement benefit two months early, effective August 1, 2012, by using his "banked hours."  It was these very "banked hours" that Mr. Rees was later notified could not be counted towards his time of service.

Knowing that retirement decisions are substantial decisions for plan participants, the Pension Fund provided Mr. Rees with calculations in July 2012 informing him of what his lifetime benefits would be if he retired effective August 1, 2012.  Plan Administrator Kramer then notified Mr. Rees on August 1, 2012 that his pension application was approved.  As explained above, Plan Administrator Kramer attested that he confirmed that Mr. Rees worked the necessary hours in the 2012 plan year prior to sending the August 1 letter.  However, the report of Mr. Rees's hours worked at Metro Industrial for the 2012 plan year was not generated until August 2, 2012 at approximately 1:30 p.m., the day after Plan Administrator Kramer sent the letter to Mr. Rees. (Doc. #101).  Thus, it is doubtful that Plan Administrator Kramer would have been able to verify Mr. Rees's hours worked at Metro Industrial in the 2012 plan year.

The multiple representations made to Mr. Rees, dealing with his significant life decision to retire under the 30 and Out benefit, were made with gross negligence without any reasonable attempt to verify the accuracy of the representations.  Subsequent to making the representations to Mr. Rees that he was eligible for the 30 and Out benefit, Mr. Rees received pension payments for thirteen months.  Despite the Pension Plan requiring decisions on benefits to be made within 90 days, the Pension Fund waited thirteen months to terminate Mr. Rees's benefits.  These assurances, like the assurances made in *Paul*, "were so grossly negligent as to amount to constructive fraud. . . ."  *Paul*, 2015 WL 1469314, at *7.  Indeed, like *Paul*, the assurances were a crucial aspect of Mr. Rees's decision to retire and his decision not to work until October 2012 to obtain the necessary hours of service without use of the "banked hours."

-24-

### 3. Intention that representation be acted on

Next, plaintiffs must establish that the Pension Fund intended that the representation be acted on, or conduct toward the plaintiffs such that they had a right to believe that the Pension Fund's conduct was so intended.  Plaintiffs have established this element of their equitable estoppel claim.

When Mr. Rees notified Buckle that he intended on retiring in October 2012 under the 30 and Out benefit, Buckle contacted Trustee O'Donnell.  It was Trustee O'Donnell who requested a meeting with Buckle and Mr. Rees for the very purposes of discussing Mr. Rees's retirement. Trustee O'Donnell learned that Mr. Rees would work until October 2012 yet he told him that he could retire two months earlier in August 2012 by using the "banked hours."  Like *Paul*, the "logical implications are that [Trustee O'Donnell's] conduct was meant to facilitate [Mr. Rees's] retirement, and that [Trustee O'Donnell] fielded [Mr. Rees's] questions with the intention of [Mr. Rees] acting on [Trustee O'Donnell's] assurances." 2015 WL 1469314, at *8.  Nothing prevented Mr. Rees from working until October 2012 aside from Trustee O'Donnell's assurances that the "banked hours" allowed Mr. Rees to retire two months earlier.  Indeed, Mr. Rees returned to work in 2013 evidencing his willingness to have worked the requisite hours in the 2012 plan year were he aware that his "banked hours" would not count toward attaining the 30 and Out benefit.

Moreover, the Fund Office's confirmation of benefits and Plan Administrator Kramer's notification to Mr. Rees by letter that his pension application was approved was intended to communicate to Mr. Rees that he could retire.  Plan Administrator Kramer intended that Mr. Rees retire after knowing that his pension application was approved and that he and his wife were entitled to specific monthly benefits for life.  These assurances, standing alone, are sufficient to satisfy this equitable estoppel element.

-25-

### 4. Unawareness of the true facts

Next, plaintiffs must show that they were unaware of the true facts, i.e. that Mr. Rees was unaware that he was ineligible to retire under the 30 and Out benefit effective August 1, 2012. Plaintiffs have established unawareness of the true facts.

As explained above, Mr. Rees did not intend to retire until October 2012 when he would have worked sufficient hours in the 2012 plan year to obtain the 30 and Out benefit. Trustee O'Donnell explained to Mr. Rees that he could retire using his "banked hours." Until this time, Mr. Rees intended on working until October 2012, and he did not know that he could not use "banked hours" towards calculating his credited service. The Pension Plan defines "Hour of Service" as "each hour for which an Employee is paid *or* entitled to payment by a Contributing Employer on account of a period of time during which actual duties are performed." Mr. Rees was unaware that, despite Trustee O'Donnell's statements to the contrary, and although he was entitled to payment by Metro Industrial for the period of time which actual duties were performed, the Pension Fund interprets the Pension Plan as requiring the actual duties be performed within the plan year in which the hours are contributed. Plaintiffs have satisfied this element of estoppel.

### 5. Detrimental and justifiable reliance

The final traditional element of equitable estoppel plaintiffs are required to prove is detrimental and justifiable reliance on the Pension Fund's representations.

There can be no dispute that Mr. Rees detrimentally relied on Trustee O'Donnell's representation that "banked hours" would be counted towards obtaining the 30 and Out benefit, the Fund Office's written calculations in July 2012 detailing the amount of his and his wife's

-26-

lifetime benefits if he retired effective August 1, 2012, and Plan Administrator Kramer's August 1 letter informing him that his pension application was approved. Mr. Rees intended to work until October 2012 — a mere two months longer than he actually worked for Metro Industrial. Mr. Rees's decision to retire was influenced, in large part, by his declining health. At the time he made the decision, he could have worked until October 2012 without any problems. It was not until Trustee O'Donnell told Mr. Rees that he could retire in August 2012 using his "banked hours" that he decided to forego working until October 2012. Moreover, Mr. Rees detrimentally relied on the fact that the Pension Fund did not take any action within 90 days to revoke his benefits, despite the Pension Plan requiring decisions to be made on pension applications within 90 days (120 for unusual circumstances). Because Mr. Rees's pension application was approved and his benefits were being paid, he did not have an opportunity to return to work and obtain the necessary hours without using the "banked hours." Plaintiffs suffered financial damage from the revocation of benefits and future reduction to the amount of benefits. These adverse changes in position as a result of plaintiffs' reliance on the Pension Fund's representations amount to detrimental reliance. *Paul*, 2015 WL 1469314, at *8.

Moreover, plaintiffs' reliance was justifiable. Mr. Rees's decision to retire was influenced by Trustee O'Donnell's representation that "banked hours" could be used towards retirement, and the Fund Office's and Plan Administrator Kramer's written representations detailing the amount he and his wife would receive in benefits. Mr. Rees was then paid benefits for thirteen months. Plaintiffs justifiably relied on the above representations.

### 6. A written representation

Next, the court turns to the question of whether plaintiffs have offered any evidence of written representations made by the Pension Fund. The *Bloemker* court held that, in addition to

-27-

the traditional equitable estoppel elements, a plaintiff must also point to a written representation by the pension fund.  Here, multiple representations were made to Mr. Rees in writing.  First, the Fund Office in July 2012 provided Mr. Rees with specific calculations detailing the amount of his benefits effective upon retirement on August 1, 2012.  Second, Plan Administrator Kramer essentially confirmed the Fund Office's calculations when he sent Mr. Rees a letter informing him that his pension application was approved and the amount of benefits he should expect to continue to receive.  Indeed, Mr. Rees received the very amount the Fund Office told him to expect and Plan Administrator Kramer's letter informed him that he would receive for a period of thirteen months.  These representations satisfy *Bloemker*'s writing requirement.

Although there is nothing in writing from Trustee O'Donnell confirming that Mr. Rees could use his "banked hours" to retire, there is no requirement that *all* representations be in writing, only that *a* representation be in writing.  The above representations are sufficient to satisfy the writing requirement.  Trustee O'Donnell's statement provides additional evidence above and beyond the written representations that were made by defendants.

### 7. Unambiguous plan provisions

The next factor the *Bloemker* court requires is a showing that the plaintiff could not obtain a clear answer to the determination of benefits by resorting to the unambiguous plan provisions. Plaintiffs have established this element of their equitable estoppel claim.

Here, a determination of whether Mr. Rees's banked hours could be used towards his hours of service is not determinable by reference to the plan documents alone.  As explained, the Pension Plan defines "Hour of Service" as "each hour for which an Employee is paid *or* entitled to payment by a Contributing Employer on account of a period of time during which actual duties are performed."  Mr. Rees could not simply refer to the plan documents, which do

not explain that the hours of service must be performed in the particular plan year that the employer makes a contribution, in determining whether "banked hours" could be used for retirement.  Nothing in the unambiguous language of the Pension Plan speaks to "banked hours," including whether "banked hours" could be used towards achieving the requisite hours of service in a particular plan year.

Moreover, given the complexities involved in calculating the amount of lifetime benefits, plaintiffs could not refer to the Pension Plan to determine whether the Pension Fund Office and Plan Administrator Kramer had accurately calculated Mr. Rees's years of service and the amount of benefits he was entitled to receive.  This case, like *Paul*, involves a situation where plaintiffs could not simply look to the Pension Plan language to determine whether the representations made to Mr. Rees were accurate.

### 8. Extraordinary circumstances

Finally, *Bloemker* requires "extraordinary circumstances in which the balance of equities strongly favors the application of estoppel."  The court finds that plaintiffs have established extraordinary circumstances.

The facts of this case are more extraordinary than the court found in *Paul*.  In *Paul*, the court determined that "the circumstances surrounding Plaintiff's reliance on Defendants' assurances and the subsequent reduction of Plaintiff's benefits are nothing short of extraordinary."  2015 WL 1469314, at *10.  The court explained:

> Relying on the written Pension Calculation Statements from Defendants—statements that Defendants' company representative also expressly and personally assured Plaintiff accurately reflected Plaintiff's hire date and years of credited service—Plaintiff elected for early retirement.  Plaintiff received the benefits reflected on those written statements for more than two years before Defendants notified him that, due to an actuarial miscalculation stumbled upon during an audit: (1) Plaintiff's benefits were overstated, (2) Plaintiff's benefits would

-29-

be permanently reduced, and (3) Plaintiff would be required to pay back overstated benefits.  These are precisely the extraordinary circumstances that strongly favor the application of estoppel under *Bloemker*. [citations omitted].

*Id.*

Here, like *Paul*, plaintiffs relied on (1) Trustee O'Donnell's representation that "banked hours" would count towards obtaining special retirement; and (2) written representations from the Fund Office and Plan Administrator Kramer representing to Mr. Rees what he and his wife would obtain in lifetime retirement benefits if he retired effective August 1, 2012.  Moreover, like *Paul*, Mr. Rees received the benefits reflected on those written statements provided by the Fund Office for thirteen months before being notified that an audit revealed that he did not obtain 30 years of service.  The difference making this case more egregious than *Paul* is that, at the time Mr. Rees was notified that he did not obtain 30 years of service, there was no way he could turn back the clock because the Pension Fund had eliminated the benefit subsequent to Mr. Rees's decision to retire.  Moreover, unless and until Mr. Rees lives to be age 55, his wife may never obtain benefits in the event of his death.  Like the court determined in *Paul*, "[t]hese are precisely the extraordinary circumstances that strongly favor the application of estoppel under *Bloemker*." The balance of the equities favors granting plaintiffs' motion for summary judgment on the equitable estoppel claim.

Accordingly, judgment shall separately enter in favor of plaintiffs and against the defendant Pension Fund reinstating the special retirement benefits effective August 1, 2012, and directing the Pension Fund to pay Mr. Rees the benefits that have been suspended since September 2013.

### B. Remaining Claims and Motions

-30-

Given that judgment shall enter in favor of plaintiffs, it is not necessary to reach the remaining claims in plaintiffs' third amended complaint. Thus, plaintiffs' motion for summary judgment as it relates to these claims will be dismissed as moot. Likewise, plaintiffs' motions for a preliminary injunction and to strike defendants' response brief are moot because they have obtained final relief.

In addition, the court will dismiss as moot the parties' cross-motions to resolve objections to the administrative record/joint appendix. These motions only relate to Count I, which the court does not reach.

The court will also deny defendants' motion for judgment on the administrative record. For the reasons explained above, plaintiffs' are entitled to judgment, and the Pension Fund shall be equitably estopped from revoking the special retirement benefits. Therefore, defendants are not entitled to judgment on the administrative record.

Finally, because the equitable estoppel claim applies only to the Pension Fund, the claims against the remaining defendants are dismissed without prejudice.

## IV. CONCLUSION

For the reasons explained above, plaintiffs' motion for summary judgment is GRANTED IN PART and DISMISSED IN PART AS MOOT, plaintiffs' expedited motion for injunctive relief is DISMISSED AS MOOT, plaintiffs' motion to resolve objections to the joint appendix is DISMISSED AS MOOT, defendants' motion to resolve objections on the administrative record is DISMISSED AS MOOT, defendants' motion for judgment on the administrative record is DENIED and plaintiffs' motion to strike is DISMISSED AS MOOT.

IT IS SO ORDERED.

Dated:  September 30, 2015

s/George Caram Steeh
GEORGE CARAM STEEH

-31-

UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 30, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---